Okay, the next argument case is number 16, 1145, Survantage Financial Services against the United States. Mr. Lane. May it please the Court. Counsel for Plaintiff Appellant Survantage Financial Services, I would like to begin by giving some context to this case, which involves financial management software. This is a type of software that's used by all federal agencies to essentially manage the entire cycle of receipts and disbursements. It includes tracking their funded and budgeted dollars to their expenditures and the ability to create financial statements. And Survantage is one of only a handful of providers of this type of software, generally competing against large commercial enterprises. And Survantage has been providing and servicing its software for the Department of Homeland Security since before it was known as DHS. But going back to 2004, DHS and its components have been trying to, in our view, push Survantage out of this small market in favor of the large commercial brands. There have been big protests. There have been corrective actions, changes in technology, changes in administrations. But through all of this, Survantage's aim has been consistent. Survantage wants to compete with the same software and services that it has been providing to DHS for over the past decade. Of course. Even if all of that's true, we have limitations on, and fairly strict limitations, with respect to the scope of the CFC's jurisdiction as well as ours. Right. And so the issues that we're here today are directly on point with that. The first one being the trial court's jurisdiction. And the jurisdiction issue that we've got is that certain DHS components have interpreted a memorandum written by the Office of Management and Budget, OMB, that they must procure financial systems through a designated shared service provider, a federal shared service provider that I'll refer to as an FSSP. And essentially, the court took the position that our allegations in relation to this were only alleging arbitrary and capricious action and not violations of law. But if you look at the substance of what we've argued, it's that the agency's interpretations of this memorandum are in violation of the law, and we've named three statutes. These were in our complaint, these were in our briefs, and these were in our oral argument. We believe the court misconstrued- But that's not the jurisdictional question, is it? Jurisdiction question is whether there's any right of appeal at all when the contract, let's say, is kept within the government. I understand there's- Unless we cross that bridge, the rest of it is irrelevant. I understand there's two jurisdictional questions I should clarify. One of the defendants raised on appeal, which was the jurisdiction of the court in the first place to consider this issue, and so I'll back up to that point. And we believe, as the trial court did, that this fits squarely within this court's findings and holding in the case distributed solutions. As in that case, the vendors here initiated the procurement process, which is statutorily defined, the term procurement, as beginning with the process of determining a need. And here, as in distributed solutions, these DHS components reached out to commercial vendors to determine a need. The trial court found that that is true. And so the trial court found there was jurisdiction in the first place consistent with the holding of distributed solutions. But putting that question aside, the problem is that even if we accept the proposition that the memo misinterpreted certain statutes or regulations, the memo itself, while it ultimately was sort of getting down the road toward procurement, wasn't in connection with the particular procurement for purposes of that exercise of jurisdiction, was it? I agree. We're not challenging- The OMB Memorandum is a statement of policy, and we're not challenging the OMB Memorandum. We certainly would not intend to do so. What we're challenging is the fact that these three DHS components made procurement decisions based on their interpretations of that memorandum. And in doing so, they essentially interpreted that OMB Memorandum as allowing them to circumvent the Competition and Contracting Act, the Economy Act, and the Government Management Reform Act, each of which has substantive requirements that tie the agency when it's making a choice. A choice is between using an interagency agreement under the Economy Act, or a choice is between using a federal shared service provider, as in the Government Management Reform Act, or a choice is using a sole source procurement, as in SECA. Each of those laws has requirements that the agency has to abide by when making that choice. So where does the jurisdiction kick in? So you're saying that kicks in the minute an official reads this memorandum and interprets it? Whenever the agency reaches out to the commercial market to assist in determining a need. But is a need the same as a procurement for purposes of jurisdictional analysis? The statute that this Court has held as defining the term procurement says that it begins with the process of determining a need. That a procurement, the language that says that it must be in connection with a procurement? Well, the statute that says in connection with a procurement is the Tucker Act. So it says a violation of law in connection with a procurement or a proposed procurement. And in the RAMCOR case, this Court interpreted in connection with is a very sweeping and scoped phrase. And then in distributed solutions, this Court interpreted procurement as it's defined in, and I don't have the statute handy with me, but I know it's in our briefs, as beginning with the process of determining a need. And it was a very broad definition of procurement. Let me take you back to the fundamental question. Are you then saying it doesn't matter whether anyone in the commercial market is capable of providing the, of satisfying the need that once such a contact is made, the government can never decide to withdraw from the commercial market? I think that would be a problem understanding as opposed to jurisdiction. Whatever it is, that's a fundamental question, is it not? It is. But here, Savanage responded to the RFI and the agency found that the commercial market could meet its needs. So you're saying the government was prohibited from withdrawing this procurement from the commercial market? No, I'm saying that the government, in making that choice as to go to the commercial market as opposed to using the process that's used here, it had to follow three laws in particular. The Competition and Contracting Act, the Government Management Form Act, and the Economy Act. And those statutes, to give an example, the Economy Act requires, before using an interagency agreement, that the agency determine that the services and goods cannot be acquired as, in the language of the statute here, at 31 U.S.C. 1535, by contract as conveniently or cheaply by a commercial enterprise. So the answer to my question is yes, they're prohibited. Unless they make that determination, as well as the other determinations under the law. Yes. How do you deal, though, with the Court of Federal Claims analysis that said that to the extent that you have to fall within the reviewability component of 1491b1, that you have to be concerned with a particular procurement or contract, not just the procurement process? Well, there was a particular procurement initiated when the Coast Guard issued an RFI. The language of that RFI was to identify possible available sources able to provide a financial management system software as a service to include all hardware, software, system operation and maintenance for support for the financial procurement asset acquisition management domains of the U.S. Coast Guard. It goes on to state specific information that it wants from respondents to that RFI. And so, by virtue of that process, it did initiate the process of a proposed procurement and that's what the trial court found and why it found jurisdiction in the first place. Right, but there's two different steps, right? One is the broad jurisdiction of the Court of Federal Claims, which I know the government objects to that conclusion, but the Court of Federal Claims didn't find that conclusion to be determinative with respect to its ability to review the particular claims at issue. Right. The particular claims at issue here, if I understand this right, going forward, is whether the agency's interpretations of the OMB memorandum fall within the gambit of that Tucker Act jurisdictional provision. Yes. And so, where I would say the focus there is the fact that we did allege that the Government Management Reform Act, the Economy Act and the Competition and Contracting Acts, the avoid competition, to avoid the commercial market. So, that choice is made to avoid the commercial market after starting the process with the commercial market. They've made a choice to avoid the commercial market and in doing so, they never did the determinations that were required under any of those three laws. And that's where the violation of law in connection with the proposed procurement happens to tie it back to the Tucker Act. I thought you had a much better argument in saying that on withdrawing, they didn't really avoid the commercial market because the government agency was provided by Oracle anyway and was in the commercial market. And therefore, the question that I keep asking you, because of the fundamental position, that it doesn't matter how that question is answered. But you're not pressing that argument? I'm not sure if I understand that angle. That they weren't really avoiding the commercial market at all when they took this project within the government because the government agency was being commercially served. Right. That goes to the Competition and Contracting Act violation where they've effectively got a sole source solution by virtue of reaching out to the Federal Shared Service Provider who is entirely reliant on the Oracle software and Oracle software integrators who provide that service component to it. But the government position, if I understand it, is that they have every right to do that under the law and it's hard to see where the boundary is. Well, I again think the boundary has to be whenever the agency reaches out to the commercial market, not just an RFI to a Federal Shared Service Provider, which they did that. They issued requests and engaged in market research with them as well. But whenever they've initiated that contact with the commercial market to determine this need, which is a perfectly reasonable thing to do, of course, to compare the commercial market to what the Federal Shared Service Provider is offering. But once they've done that, that's when these statutes kick in to form those requirements. And these statutes are in place to prevent agencies from abusing interagency agreements. Obviously, that's what the Economy Act's purpose is. The Competition and Contracting Act is in place to prevent abuses in regards to competition issues. And the Government Management Reform Act has rules in its statute because it is a very unique arrangement to have these Federal Shared Service Providers in large ways competing with or providing services and products from the commercial market. And so these statutes have put protections in place to try and serve that. And those are the protections that were avoided and those are the protections that we try to assert as violations of law in connection with this main issue. So I hear you saying that in order to prevail as a matter of law, we must hold that once a solicitation offer is made to the commercial market, it can't be withdrawn. It can only be withdrawn once they have complied with the statutes that are part of that next phase. So if they want to abandon the process altogether, if they reach out to the commercial market and they find that there is no alternative for them and they're done with the procurement, go a different path, then there's nothing that requires them under the Economy Act certainly to do anything for an interagency agreement or the GMRA or the Competition and Contracting Act. If they want to engage in interagency agreement, then they've got to comply with the Economy Act. If the next step is after they've made that decision to do an interagency agreement, then they necessarily must comply with the Economy Act. If the next step is to use a franchise fund, they must comply with the Government Management Reform Act. If the next step is to engage the commercial market or a sole source avenue, then they must comply with the Competition and Contracting Act. Okay, let's hear from the government on these points and we'll save you rebuttal time. Thank you. Mr. Grimaldi. Good morning, Your Honors. Your Honors, I'd like to start today with the fundamental question that Your Honor raised about jurisdiction here. The scope of the decision below, the scope of subvantage argument, is that once the agency considers commercial alternatives, it cannot turn around. And this is what we find to be the jurisdictional problem in a case below. The court held that there's jurisdiction to choose from one procurement method over the other. But you're not saying that they're prohibited from questioning what the alternative turns out to be. That is, in this case, we're told an internal process. Your Honor, just to clarify your question, if I might, to challenge what was ultimately brought. Yes. As the court below found that there is no jurisdiction to actually challenge the interagency agreements because those were not procurement contracts. So in that situation, I would say no, Your Honor. But what's troublesome here is that apparently the agency then went out or stayed with the commercial market, a different purveyor. And you're not telling us that that is insulated from inquiry. Let me clarify the facts on there. The government did not use a commercial entity. The government here, DHS, these three DHS components, TSA, DNDL, and the Coast Guard, are utilizing the services of the Department of Interior Business Center. Those are federal employees. DOIBC, in turn, hires commercial partners to help them with their process. But the entity that is providing the services to the DHS components is Department of Interior. And I want to also clarify the concept of Oracle. Oracle is just a piece of software. It's a piece of software that can be modified. In fact, Savantage's product, which has a different name, Ultimate, I believe, is based upon Oracle. You can see that in the first footnote, I believe, of the court's decision. The modernization of financial management services is the actual doing of the management service, the actual work. Of course, it involves working on software. But this isn't a simple software purchase, Your Honor. I just want to clarify. Well, we don't know the answer to that. The question that concerns me is whether that's insulated from inquiry. Well, yes, Your Honor. And the court's decision below relied upon an overly broad reading of distributed solutions. Now, distributed solutions is a very unique case. This court found jurisdiction in distributed solutions where the agencies issued an RFI, sought information regarding commercial software packages. You received the information from vendors, considered them in scoping their own requirements, created these new requirements, and then handed them off to a prime contractor, instructing that prime contractor to then conduct a subcontract award to obtain the software and then implement it at the agencies. On top of that, the agency officials sat on the selection committee for the subcontract award. So, I mean, really, this court saw that it walked like a duck and it talked like a duck, that it was a procurement. It found there to be jurisdiction. There needs to be a bright-line rule here, Your Honors, where what is actually a proposed procurement? In distributed solutions, we have these unique facts where, ultimately, the subcontract awards were selected by the government, but they were immune from the FAR and other procurement regulations because they were under the guise of a subcontract award. But the problem is with your theory is that if we were to buy the notion that they could go all the way down the road to the point of demanding that the procurement be an internal procurement rather than an external procurement, there would never be any ability to challenge that. So I don't understand how you're not initiating a procurement or there isn't action in connection with a procurement when you're analyzing which direction that procurement is going to come from. The problem, if we are saying that the Tucker Act jurisdiction kicks in at the point when the government is analyzing which alternative to do, every nascent thought about how to acquire something could be subject to Tucker Act jurisdiction. If two contracting officers are walking down the hallway and one stops and talks to the other saying, hey, should we solicit this externally to commercial contractors or should we just do this internally? And the answer is no, let's just do it internally. That is not conversation that is subject to Tucker Act jurisdiction. There has to be a bright line rule. That's not the situation. No, it is not. We have a specific situation where there was a procurement, there were bidders, they were told after going through the process, you're all out of... Well, that's not actually... That's distributed solutions, Your Honor. In this present case, first off, only one of the three components here today issued an RFI. So if Savanish makes the argument now... Does it make a difference whether it's one or two? Well, certainly for jurisdictional purposes because if the point of issuing the RFI created a procurement, then lower court should have dismissed the charges against DNDL and TSA because they did not issue RFIs. Well, there's two different... I mean, the court engaged in two different analyses. I mean, in distributed solutions, we said determining a need was sufficiently part of the procurement process to give rise to jurisdiction. That doesn't necessarily mean that you can establish that there was an abuse of discretion or that there was ultimately a procurement for purposes of the Tucker Act claims. Absolutely, Your Honor, and Your Honors have read our briefs and how we argue that there could be no procurement error here anyway, even if there is jurisdiction. So I absolutely agree with you, Your Honor. The distinction here is... And this is something that the Court of Federal Claims has pointed out in the VFA case in international genomics that if there's a possibility of a Pandora's box being opened up in jurisdiction in these such cases. For instance, in the VFA case, the government owned its own software and attempted to use that software. But isn't there specifically... Or even contemplated or initiated a procurement process? Right, Your Honor, and our case is somewhere in between distributed solutions and VFA. We acknowledge that. We think the line for when a procurement should start and when a jurisdiction should kick in is a situation like distributed solutions, which the Court of Federal Claims has subsequently found to be unique facts. They certainly are unique facts, where there was the use of the RFI information to craft requirements. Here we don't have that. There's nothing in the record that indicates that the RFI was used to craft requirements. It was checking to comply with the OMB circulars whether or not the commercial market could actually supply the stuff as well as the federal shared service providers. So there's a distinction right there, Your Honors. So there is this... a breadth of cases in which the government is considering what kind of options are in terms of purchasing something, and a line needs to be formed. Probably a big difference between VFA and what it was was, can I use something I already own and not consider the possibility of going outside? Versus, I've always gone outside. Can I now decide not to go outside? Two points to that. Right now, the Coast Guard, TSA, and DNDA are receiving services from the Coast Guard. So they're not receiving them from outside. Savantage's customers are not currently before this Court. They are the components that were dismissed as on right, and Savantage has not appealed that decision. So there are familiar aspects with VFA. Also, DOI, IBC's employees do exist. They are there. They are capable of doing this work. They're similar to the existing software in VFA in that sense. So there are ties between our case and VFA. There are ties between our case, admittedly, and distributed solutions, but it is somewhere in between. And there needs to be a bright-line rule demonstrating where there is a procurement that is under the jurisdiction of the Tucker Act and where there is not. And we believe that line to be distributed solutions, as explained in our briefing. Going along with that, interested party standing suffers from, we believe, the same situation where this Court has to find interested party to mean a... to be equivalent in the GAO context under the SECA definition as well as the Tucker Act. In this Court's lower... in this Court's decision, the Court simply checked whether or not it would... disadvantage would be an interested party and a prospective offer at any commercial offering, but did not actually take a look at the SECA definition that is required to find whether there's an interested party. And the language that we point out that they ignored in our briefing is with respect to a contract or a solicitation or request for other offers described in paragraph one. And we believe that the lower court did not address this finding that they were standing for disadvantage to pursue its claims. In the event that the Court disagrees with our jurisdictional arguments, we do support the lower court's jurisdictional finding that there is limited jurisdiction here regarding the OMB Memorandum 13-8. Now... we do believe, Your Honors,  to get a second bite of the apple on the part of disadvantage, that this is not the claim that they pursued below. Below, they sought to argue that the interpretation of the memorandum by the DHS components was arbitrary and capricious within itself. That when we moved to dismiss it saying that there's no jurisdiction for these pure arbitrary and capricious elements, the reply from disadvantage was to say that there was jurisdiction here. Not that we were misunderstanding their argument that they were actually charged of alleging violations of SECA the Economy Act or the GMRA but rather that there is jurisdiction in the Court of Federal Claims for arbitrary and capricious conduct unrelated to a statute of regulation. Even before this court in its reply brief on pages 18 or 19 Savannah still makes this argument saying that there is jurisdiction below for arbitrary and capricious behavior. Just to note, Your Honors, even if the defense does not waive this it is nothing more than a collateral attack on the actual decision of the agencies. Now to be very clear the court did review the finding of procurement error in fact the component's decision to go to a federal shared service provider without doing a SECA justification and then it also dismissed the claims regarding the Economy Act and the GMRA because they did not pertain to a procurement contract. An argument that the agencies here the three components here violated SECA and these other acts based upon an interpretation of a memo is just another way of arguing the same thing. The allegations were that they violated SECA by going in-house to another part of the government. Whether that was done at that point or by interpreting the interpretation of a memo leading to that isn't the actual final agency action by the government. It's this move to the federal shared service provider. Why they did it when they were interpreting a memorandum that Savannah still has not argued as a force in fact of law is irrelevant. If your honors have no further questions I'll just touch briefly on harmful error and just note that Savannah's argument would require the lower court to find harmful error even when the record says the opposite which is exactly what Shinseki B. Sanders of the Supreme Court says is not true. We believe that the factual predicate exists in the record to use the Batten and Emery test for prejudice and that the lower court's decision was correct. If the court has no further questions we respectfully request the court dismiss the appeal or the alternative affirm. Any questions? Thank you Mr. Peraldo. Mr. Lane. Thank you. The government's position here is that they've created such a unique procurement that it's unchallengeable in court but it's not that unique. It is just like what happened in Distributed Solutions. There was an RFI. Our client Savannah did respond to that RFI and the Coast Guard determined that the commercial market could meet its alternatives but that in accordance with the OMB memorandum the way it was interpreting the OMB memorandum it was going to proceed with a Federal Shared Service provider instead. And this concept that the other two agencies didn't do the same degree these three agencies were working in tandem and as the defendant notes TSA and DNDO are ultimately getting it through Coast Guard. TSA and DNDO also engaged the commercial market they just did so on a private basis. They didn't do it with a public RFI they just engaged commercial vendors to submit rough pricing and requirements in detail in that respect. The next point I want to make is that the RFIs were not just as Mr. Grimaldi stated used as some sort of preliminary process and not used to help determine the requirements. The record is littered with these determinations that the agencies did alternatives analyses and business cases wherein they relied expressly on that data from the RFIs. On the issue of the interested party where they say that the AFGE decision somehow precludes the standing in this case whenever the court in AFGE went back to the competition and contracting acts to make jurisdictional definitions of interested party. That definition was from 1984 and that definition prescribes the jurisdiction as to the comptroller general over bid protests. In 1996 that's when the Administrative Dispute Resolution Act came across and expanded the Court of Federal Claims jurisdiction to include proposed procurements and what Distributed Solutions did was it read AFGE in a manner that's consistent with the ADRA. So we feel like that standing has to be assessed in the context of the proposed procurement not necessarily limited to the actions that constrain GAO's bid protest jurisdiction. When the ADRA came along it expressly made these different whenever it added proposed procurements. What's your response to the government's point that this really isn't Distributed Solutions? Even if you're right in the reading of Distributed Solutions, factually you don't fall within the bounds of Distributed Solutions. Well in Distributed Solutions the facts that were critical were that they had an RFI and they used that RFI to shape their needs. And here there was an RFI and they used that RFI to shape their needs. And that's reflected in the alternatives analyses. That's reflected in the business cases that these agencies did. That's really just ultimately one commercial vendor that they were engaged with at that point and calling it an FSSP market. And so to I think Judge Newman's point that at the point when they were making this decision there was one FSSP vendor that they chose and moved along with. Let me ask you another question because there is a certain weight to the argument that whatever the government does is subject to review and exposure but what I still don't understand is that even if we agree with all of these threshold questions in your favor what could conceivably happen to change the result? Well what would happen to change the result is that the agencies would have to do a real comparison. So here they engaged with RFIs and what that process meant. We've used that term a lot. What it meant is they went out to industry and said that we're looking to do this. We want to procure this type of system in this type of way. Here's a list of some 30 requirements that we need to have met. And then proposed to us what type of stuff that you have on what's called a rough order of magnitude ROM basis. And so the seven qualified contractors submitted ROM proposals with rough pricing based on essentially their suggested way of doing this. And so when the agency made these comparisons, the agency wasn't comparing apples and apples. The agency was comparing what the FSSP was offering through Oracle to what seven other vendors came up with as possible solutions and then selected based on the OMB memorandum of the FSSP without ever giving them a common set of requirements to look at. And so what we want would be just a common set of requirements that Savantage the commercial market could bid to to make these comparisons that are required by the statute. They're required by three statutes and those requirements got pushed by the wayside whenever and getting to the prejudice issue whenever the trial court said yes there's not a SECA justification but I'll just make one for the agency and she ignored all of the questions  asked before the economy act was met. The nature of unique qualifications is another one of those elements under there. She didn't assess whether any of that was met in a substantive point of view.  answer to your question is what could be done to rectify this was a common set of requirements to which they could bid. So the answer to your question  that there is a requirement for competition for everything. It's a mandatory competition. Not for everything. Only in a situation where there has been a solicitation which was then seeking  survey. It's market research. Is this the line that you believe should be drawn? No, we believe the line should be distributed solutions. It's a step beyond simple market research. But if that's the line this court draws, neither of them issued an RFI. It was not seeking offers or bids that we could accept to create a contract. In fact, it did not cancel the RFI. It simply reviewed the information and determined that it would go towards a federal shared service provider. Thank you. Thank you both. The case is taken under submission. All rise.